**HOYT INVESTMENT COMPANY,**
**et al., Appellant,**

**v.**

**BLOOMINGTON COMMERCE AND**
**TRADE CENTER ASSOCIATES, et**
**al., Respondents.**

**No. C7–86–39.**

Court of Appeals of Minnesota.

July 8, 1986.

Review Denied Sept. 24, 1986.

James R. Bresnahan, William D. Paul, Cochrane & Bresnahan, St. Paul, for appellant.

Mark J. Kiperstin, William S. Rosen, St. Paul, for respondents.

Heard, considered and decided by POPOVICH, C.J., and FOLEY and FORSBERG, JJ.

## OPINION

POPOVICH, Chief Judge.

Appellant challenges a judgment dismissing its complaint, claiming the trial court erroneously determined appellant's contractual rights under a settlement agreement. We reverse.

## FACTS

On July 21, 1981, respondent Bloomington Commerce and Trade Center Associates, a partnership consisting of William O. Cooley and Arthur J. Petrie (Cooley-Petrie), executed a purchase agreement with seller Metropolitan Sports Facilities Commission (Commission). Closing was scheduled for November 1, 1982 with a purchase price of $14,249,075. The involved property consisted of the southerly 99.3 acres of the Metropolitan Sports Area in Bloomington which once was home to the since demolished Metropolitan Stadium. Through private sale negotiations, the Commission had received offers to purchase from David S. Owen, Gordon Gund and George Gund, III, Cooley-Petrie, and appellant Hoyt Investment Company, a partnership consisting of Bruce K. Hoyt and Steven B. Hoyt (Hoyts).

On July 30, 1981, appellant sued the Commission and others including Cooley-Petrie, alleging irregularities in the sale negotiations, declaring entitlement as the highest bidder and seeking to set aside the purchase agreement. Appellant dismissed its suit on December 2, 1981 in exchange for a settlement agreement which permitted Cooley-Petrie to continue to "have the right to acquire [the] property from the Commission under the terms and conditions of [the] July 21, 1981 Agreement with the

Commission." Specifically the settlement agreement stated:

1. Two Hundred Fifty Thousand Dollars ($250,000.00) shall be paid to the Hoyts upon the closing of the July 21, 1981 Agreement, between Cooley-Petrie and the Commission for the purchase of the Met Stadium property as now or hereafter amended. In the event there is no closing under said agreement and title to the property, which is the subject thereto, remains in the Commission, then this covenant shall be null and void.

2. * * * If Cooley-Petrie fails to or elects not to acquire said property, the right but not the duty to acquire said property is to be assigned to the Gunds. If the Gunds elect not to exercise the right to acquire said property following the default or election of Cooley-Petrie not to do so, on written notice of not less than thirty (30) days before closing with the Commission, the Gunds will so notify the Hoyts and the Hoyts will have the option to exercise the rights of the Gunds under said Agreement. The Hoyts shall not have the right to exercise said option unless:

a. The Hoyts have replaced all letters of credit posted by Cooley-Petrie and/or the Gunds with letters of credit obtained by the Hoyts at the Hoyts sole expense and/or the Hoyts have paid to Cooley-Petrie and or the Gunds all monies paid by Cooley-Petrie and/or the Gunds under said Agreement of July 21, 1981, and

b. The Hoyts have paid to Cooley-Petrie and/or the Gunds as their interest may appear a sum of money in cash not exceeding Two Hundred Thousand Dollars ($200,000.00) for all reasonable out-of-pocket expenses incurred by Cooley-Petrie prior to November 20, 1981, with respect to the purchase of the property described in said July 21, 1981 Agreement including legal architectural and accounting fees and other expenses.

On September 27, 1982, Cooley-Petrie sent counsel for the Gunds a letter stating: There are a number of obstacles that have occurred that may prevent us from closing on a timely basis. *However, as of yet we have not determined positively that we will not close on November 1, 1982.* We have communicated this concern with Mr. Poss, Executive Director of the Commission and have informed him that if we have not resolved, to our satisfaction, the barriers to our closing this transaction that we will ask for an extension of the closing date.

* * * We have indicated to Mr. Poss that we will contact the other three groups who made offers on the stadium property, through their lawyers, and offer them the opportunity of closing this transaction on November 1, 1982. This letter is that offer.

\* \* \* \* \* \*

However, we would like to offer you, and each other offeror who qualified as a purchaser by the June 11, 1981 deadline, the opportunity to close this transaction on November 1, 1982. To do so, we would request the following:

1. You notify us of your intention to close on or before October 10, 1982;

2. You reimburse us for our out-of-pocket expenses and all costs, fees and other expenses incurred or paid, plus interest at prime of Northwestern Bank of Minneapolis, plus 2%, as the same changed from time to time. * *

3. You deposit in cash in an account jointly in the name of the Metropolitan Sports Facilities Commission, Arthur J. Petrie and William O. Cooley and yourself, Two million dollars, the amount required for closing on November 1, 1982. In lieu of the cash deposit, an irrevocable letter of credit in that amount * * *;

4. You agree in writing by October 15, 1982, subject to the approval of the Metropolitan Sports Facilities Commission, that you will assume all of our obligations to purchase the subject

property under the Purchase Agreement, dated June 11, 1981, as amended July 21, 1981.

The posting of the balance of the Letters of Credit as set forth in our agreement with the Commission and other duties and obligations of the purchaser under that agreement shall be accepted and performed by you.

If, for any reason, the closing does not occur on November 1, 1982, you would forfeit all cash monies you have paid to us and any cash deposit or letters of credit posted to guarantee closing.

If you believe you can accommodate the restrictions placed on the site with respect to permits and approvals, and you want to close on November 1, 1982, you have our blessing and assured co-operation. If we do not hear from you by October 10, 1982, and do not have the required deposits by October 15, 1982, we will consider whether we should close or make a written request of the Commission for an extension of time to close. Please be advised that if you wish to close this transaction and accept an assignment of our rights and obligations under the contract mentioned above, that we will do everything in our power to assist and accommodate you.

(Emphasis added). The same letter was addressed and sent to counsel for the Hoyts.

On October 1, 1982, the Gunds through counsel rejected Cooley-Petrie's "offer" of September 27 and stated:

I commend to your attention paragraph B.2. of the agreement between the Gunds, yourself and Mr. Arthur Petrie, and Messrs. Bruce K. Hoyt and Steven B. Hoyt. In our view the rights of refusal contained in that paragraph continue in the event that the November 1, 1982 closing is deferred and may be exercised by us in the event you make a definitive election not to close or default under your obligations on November 1, 1982, or any subsequent date. These rights continue regardless of whether or not there are any interim changes in the terms and conditions of your purchase agreement with Metropolitan Sports Facilities Commission.

On October 7, 1982, the Hoyts through counsel responded to Cooley-Petrie's "offer", stating:

Mr. Bruce Hoyt, Mr. Steven Hoyt and the Hoyt Development Company are not presently in a position to discuss or accept the offer contained in your September 27 letter.

We have reviewed the Agreement between yourselves, the Gunds and the Hoyts. We are of the opinion that the rights of the Hoyts contained in that Agreement continue until the termination or cancellation of your Agreement with the Metropolitan Sports Facilities Commission. Therefore, if the proposed closing date of November 1, 1982 is extended by the Commission, the Hoyts have the right to exercise their rights under the Settlement Agreement if, and when, you decline to close with the Commission. Those rights continue under the terms of the Settlement Agreement notwithstanding any amendments or modifications of the underlying Agreement between yourselves and the Metropolitan Sports Facilities Commission.

The closing date of the prime purchase agreement was subsequently extended until January 4, 1984.

Cooley-Petrie did not obtain the property on January 4, 1984. The Commission viewed Cooley-Petrie as being in default and saw itself as free to sell the property to another buyer and sue Cooley-Petrie for any deficiency in the sale price. The Commission thereafter entered direct negotiations with the Port Authority of the City of Bloomington (Port Authority). Cooley-Petrie publicly claimed a continued interest in the property.

On June 15, 1984, Cooley-Petrie agreed to quit claim to the Port Authority on closing date all its rights in the property. For assignment of the interest, the Port Authority paid $2,147,000, of which $250,000 was escrowed in response to the Hoyts' claim made at a Port Authority public hear-

ing on June 11, 1984. The purchase price included $1,397,000 for return of Cooley-Petrie's "invested hard costs" and $750,000 as settlement costs.

The Commission and Cooley-Petrie as buyers entered a mutual release on July 10, 1984, providing:

2. The provisions of paragraphs 3, 4 and 5 of this Mutual Release Agreement shall be effective only upon the closing of a sale of the southerly portion of the Metropolitan Sports Area from the Commission to the Port Authority of the City of Bloomington, Minnesota.

3. The Commission shall retain all funds previously paid by Buyers to the Commission and interest earned thereon; and Buyers waive all claims or rights, if any, to obtain a return of such funds and interest.

4. The July 21, 1981 Agreement between the parties and all amendments to it are cancelled; and no party to it may claim any right under it in the future.

5. Each Buyer hereby forever releases the Commission from all claims of any nature arising from the July 21, 1981 Agreement and any amendments to it. The Commission hereby forever releases the Buyers from all claims of any nature arising from the July 21, 1981 Agreement and any amendments to it.

6. Buyers hereby represent and warrant to the Commission that there is no agreement with a third party concerning the July 21, 1981 Agreement and the amendments to it or an assignment of their rights or claims under it, if any, to a third party which could be construed as being effective prior to this Mutual Release Agreement becoming effective.

On July 20, 1984, the Commission entered a land sale agreement with the Port Authority and the City of Bloomington. Purchase price was $14,500,000. Closing was set for September 10, 1984 and did occur on that date, effectuating both the quit claim and the mutual release.

The Hoyts made repeated unsuccessful demands for payment of the $250,000. On September 6, 1984, they sued Cooley-Petrie, the Port Authority, the City of Bloomington and the Commission, claiming (1) they were owed $250,000 under the December 2, 1981 settlement, (2) the Port Authority, the City of Bloomington and the Commission combined to tortiously interfere with the settlement, (3) the release made pursuant to the 1981 settlement should be set aside as null and void, and (4) the Commission is obligated to accept the Hoyts' bid and temporarily and permanently enjoin the sale to the Port Authority.

A court trial was held in July 1985. The trial court issued its findings, conclusions and order for judgment on October 9, 1985. The court found it had dismissed the Hoyts' claim against the Commission by summary judgment entered June 5, 1985, neither the Port Authority nor the City of Bloomington interfered with the contractual rights of the 1981 settlement, and "[a]t all times relevant herein, the [Hoyts] did not have any claim for any monies due under said agreement of December 2, 1981." With specific reference to the 1981 settlement, the trial court found:

Said agreement of December 2, 1981, included certain provisions concerning a possible assignment of said agreement of July 21, 1981, to parties identified in the December 2, 1981, agreement as the Gunds, and a possible subsequent assignment from the Gunds to the Hoyts. With respect to said provisions: .

(a) The complaint herein makes no claim for relief under said provisions of the December 2, 1981, agreement;

(b) The only relief sought in the complaint is the payment of money damages;

(c) The Gunds are not a party to this action;

(d) Cooley and Petrie and Associates fully complied with all of said provisions of said agreement by serving a written notice upon the Hoyts by letter dated September 27, 1982;

(e) The Hoyts waived any and all rights that they may have had pursuant to said provisions of said agreement of December 2, 1981, by declining

to close under the July 21, 1981, agreement after receipt of said notice, and further by advising the City of Bloomington at a public hearing on July 11, 1984, that the Hoyts' only claim under the December 2, 1981, agreement was a claim for money damages in the amount of $250,000.00, and further by failing to take any action to assert their claim of a right to close under the July 21, 1981, agreement prior to the purchase of the Metropolitan Sports Area by the Port Authority of the City of Bloomington.

The trial court ordered the Hoyts' complaint against the remaining defendants dismissed with prejudice. The court also granted a 30–day stay of entry of judgment. Appeal is made from the judgment which was entered November 14, 1985.

### ISSUES

1.  Is this appeal proper?

2.  Does sufficient evidence support the trial court's findings?

### ANALYSIS

■ 1.  Notice of appeal states appeal is made from a judgment filed November 10, 1984. Although the order for judgment dated October 9, 1984 was stayed 30 days, judgment was not actually entered until November 14, 1984. The involved judgment was attached to the notice of appeal. "A notice of appeal is not insufficient due to clerical errors or defects which could not have been misleading." *Kelly v. Kelly*, 371 N.W.2d 193, 196 (Minn.1985). We review appellant's claim.

■ 2.  Appellant claims respondent Cooley-Petrie's letter of September 27, 1982 was a sham offer to purchase Cooley-Petrie's rights and did not fulfill Cooley-Petrie's obligations under the 1981 settlement. It asserts the September 10, 1984 closing between the Port Authority and the Commission was actually a closing under the July 21, 1981 prime purchase agreement. Appellant claims therefore it is enti-

tled to $250,000 as required under the 1981 settlement.

In this case [appellant] did not move for a new trial, but merely appealed from the judgment. Findings of fact made by a trial court sitting without a jury will not be set aside unless they are clearly erroneous, with due regard for the opportunity of the trial court to judge the credibility of the witnesses. It has been held that when the lower court is the trier of fact, its findings on disputed questions are entitled to the same weight as a jury verdict and will not be upset merely because a reviewing court may view the evidence differently. The findings must be manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole.

*Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 726 (Minn.1985) (citations omitted).

a.  *Stated claim.*

The trial court found:

The complaint herein makes no claim for relief under said provisions of the December 2, 1981, agreement.

Appellant claims that finding is clearly erroneous and cites points 13–15 of its complaint:

That William O. Cooley and Arthur J. Petrie and Associates entered into an Agreement with the Port Authority by the terms of which they assigned to the Port Authority all right to purchase said property pursuant to the prime contract of July 21, 1981, which assignment was subject to the terms, conditions and obligations of the aforesaid settlement agreement.

That Cooley and Petrie did not comply with the terms and conditions of Paragraph 2 of the Agreement of December 2, 1981 concerning notice to the Gunds and/or the Hoyts, that they entered into said agreement with no intent to execute it or comply with its terms, and for the express purpose of wrongfully and unlawfully inducing Plaintiffs to dismiss their previous actions.

Although demanded of Cooley and Petrie, Cooley and Petrie have denied liability to pay to Plaintiffs any sum whatsoever pursuant to the Agreement of December 2, 1981, all to Plaintiffs damage in an amount of $250,000.00.

The trial court's finding is erroneous. Appellant's complaint makes a claim under the 1981 settlement agreement.

b. *Assignment.*

The trial court found:

Cooley and Petrie and Associates fully complied with all of said provisions of said agreement by serving a written notice upon the Hoyts by letter dated September 27, 1982;

The Hoyts waived any and all rights that they may have had pursuant to said provisions of said agreement of December 2, 1981, by declining to close under the July 21, 1981, agreement after receipt of said notice, and further by advising the City of Bloomington at a public hearing on July 11, 1984, that the Hoyts' only claim under the December 2, 1981, agreement was a claim for money damages in the amount of $250,000.00, and further by failing to take any action to assert their claim of a right to close under the July 21, 1981, agreement prior to the purchase of the Metropolitan Sports Area by the Port Authority of the City of Bloomington.

■ Appellant claims Cooley-Petrie breached the settlement agreement by assigning its rights to the Port Authority instead of assigning to the Gunds (and alternatively to the Hoyts if the Gunds declined). Appellant challenges the court's finding as erroneous because the September 27, 1982 letter was not an offer contemplated by the 1981 settlement. It asserts the 1982 letter was written only to provide the Commission with reason for extending the closing date under the prime purchase agreement.

The 1981 settlement states, "If Cooley-Petrie fails to or *elects* not to acquire said property, the right * * * to acquire * * * is to be assigned to the Gunds." (Emphasis added). But the September 27, 1982 letter stated Cooley-Petrie had not decided whether it would close on November 1, 1982. As stated in the Gunds' responsive letter to the September 27 "offer", assignment of purchase rights under the 1981 settlement would be triggered after Cooley-Petrie made a definite election not to close. Cooley-Petrie never made that election. The September 27 letter did not trigger a timely offer.

Appellant also challenges the September 27 letter because it imposed additional burdens required to assume Cooley-Petrie's rights which were not present in the original 1981 settlement. The settlement required the Hoyts to replace all letters of credit and reimburse Cooley-Petrie's expenses up to $200,000. The September 27 letter required payment of Cooley-Petrie's expenses without limitation, escrow of $2,000,000 or an irrevocable letter of credit in that amount, and posting the balance of the letters of credit as per the 1981 settlement. If for any reason closing did not occur, the Hoyts would forfeit all cash monies paid to Cooley-Petrie and any cash deposit or letters of credit posted to guarantee closing. That "offer" significantly differs from the 1981 settlement agreement.

The trial court's finding the September 27 letter fulfilled Cooley-Petrie's obligations under the 1981 settlement is erroneous as not supported by the evidence. That letter presented an "offer" incongruous with the settlement both in terms of its timing and its content. Both Cooley-Petrie and the Hoyts continued to have an interest in the purchase and subsequent closing.

c. *Closing.*

The trial court found:

On or about December 2, 1981, the Hoyts entered into a written agreement with Cooley and Petrie which, in relevant part, provided that:

(a) The Hoyts would be paid $250,000.00 upon the closing of the July 21, 1981, agreement between Cooley, Pe-

trie, Associates and the Commission; and

(b) In the event that there was no closing under said agreement of July 21, 1981, said provision for payment of money to the Hoyts would be null and void.

There has not been a closing under said July 21, 1981, agreement between Cooley, Petrie, Associates, and the Commission and, consequently, the aforesaid provision of the December 2, 1981, agreement concerning payment to the Hoyts is null and void.

The July 21, 1981, agreement between Cooley, Petrie, Associates, and the Commission, as amended, provided that Cooley and Petrie were required to close and consummate the purchase provided for therein on or before January 4, 1984. Cooley and Petrie and Associates failed to close and consummate the purchase provided for in the July 21, 1981, agreement on or before January 4, 1984.

\* \* \* \* \* \*

Cooley and Petrie and Associates were in default under the July 21, 1981, agreement, and from and after January 4, 1984, had no further right, title, interest or claim in and to the Metropolitan Sports Area property.

■ Appellant claims it is an erroneous finding Cooley-Petrie had no further interest after failing to close on January 4, 1984. It asserts "closing" within the meaning of the 1981 settlement did occur and the involved settlement provision was not rendered null and void.

The prime purchase agreement states:

The Closing of the purchase contemplated hereby will take place \* \* \* on November 1, 1982. \* \* \* Other adjustments may be made in the date for final Closing as Buyer and Seller mutually agree in writing. If the Closing does not occur by the last date for Closing as provided in this Paragraph 4 or as otherwise agreed pursuant to this Paragraph 4, the Agreement formed by the acceptance of this Offer shall be null and void, in which event neither Buyer nor Seller shall be liable for damages hereunder and all Earnest Money paid by Buyer will be refunded.

The mutual release between the Commission and Cooley-Petrie provided for cancellation of the prime purchase agreement and return of Cooley-Petrie's earnest money. But those terms of the release were effective only upon closing between the Commission and the Port Authority and, in effect, constituted a written agreement pursuant to the prime purchase agreement which extended the contemplated closing until the date of closing with the Port Authority.

The trial court finding that Cooley-Petrie was in default possessing no rights after January 4, 1984 is not supported by the evidence. Cooley-Petrie continued to possess an interest under the prime purchase agreement after the January 1984 scheduled closing date.

Cooley-Petrie's retained rights in the involved property were quit claimed to the Port Authority on September 10, 1984 for $2,147,000. The Port Authority exercised those rights by closing on a land sale purchase agreement with the Commission on September 10, 1984. The $250,000 claimed by appellant here was escrowed.

Cooley-Petrie argues the closing which occurred September 10, 1984, was not the closing contemplated under the 1981 settlement because the July 20, 1984 purchase agreement was not identical to the prime purchase agreement. But the closing involved here does not concern the terms of the Port Authority's purchase. The relevant closing is that of Cooley-Petrie's interest under the prime purchase agreement.

Cooley-Petrie's viable interest under the prime purchase agreement was not merely terminated, but instead clear value for that interest was received. Cooley-Petrie received return of its costs and a $750,000 fee. Closing of its interest for profit under the prime purchase agreement occurred on September 10, 1984.

At oral argument, Cooley-Petrie could not deny having assisted in the drafting of

the 1981 settlement. That part of the settlement regarding assignment specifically addresses Cooley-Petrie acquiring the property. The clause addressing closing does not. For Cooley-Petrie to now complain an undefined term should not be interpreted within the context of the clause in which it is placed is inequitable.

We conclude the September 10, 1984 closing was a closing within the meaning of that term as used in the 1981 settlement agreement and by that agreement the Hoyts are entitled to $250,000 plus interest.

## DECISION

The trial court erroneously found a closing did not occur under the parties' 1981 settlement agreement. Appellant is entitled to recover $250,000 plus interest as escrowed pursuant to the Cooley-Petrie/Port Authority quit claim on closing.

Reversed.